RAWLS *vs.* THE AMERICAN LIFE INSURANCE COMPANY.

One having an interest in the continuance of the life of another, as his creditor, may insure the life of the debtor, and the contract for that purpose will be valid.

The fact that the debt is due to the creditor as a member of a partnership, and from another firm, of which the person whose life is insured is a member, does not alter the rule.

If such a policy of insurance is valid in its inception, the circumstance that the statute of limitations had run against the debt, before the occurrence of the death, will not affect it.

The interest of the creditor, in the continuance of the life of the debtor, cannot be held to have ceased entirely, because the statute of limitations has operated against the debt.

It is not necessary that the party holding a policy on the life of another should have an insurable interest in such life, at the time of the death, to make the policy valid, if it was valid in its inception.

A life policy is not regarded as a mere contract of indemnity.

The case of *Goodsall* v. *Baldero*, (9 *East*, 72,) disapproved, and shown to have been overruled in England, and not now law, there.

In an action by a creditor, upon a policy on the life of his debtor, the declarations of the debtor in his lifetime, in respect to his intemperate habits, or the suppression of information, are not admissible in evidence.

The omission of a person whose life is insured to make any statement in respect to any particular habit, not called for by any general or specific question put by him, will not be such a concealment as to avoid the policy. It is sufficient if he answers truly all the questions put to him, without evasion or concealment.

MOTION for a new trial, upon a case and exceptions. The action was upon a policy of insurance issued by the defendant, dated 28th July, 1853, for $5000, on the life of John L. Fish, of Rochester, N. Y., payable to the plaintiff. The complaint averred the execution and delivery of the policy, and set forth the policy and the conditions annexed thereto. It also averred the payment of the annual premiums on the policy up to July 1, 1857, the interest of the plaintiff in the life of Fish, the death of Fish at Rochester on the 24th day of February, 1857. That from the time the policy was made, to his death, Fish fully performed and complied with all the conditions of the policy to be performed and complied with by him, and did not do any act or thing pro-

hibited by the terms of the policy; and that the policy was in full force at the time of his decease. That due notice and proof of the death of Fish, and of the circumstances attending the same, were furnished to the defendant March 6, 1857, in the manner provided in the conditions annexed to the policy, and that although more than ninety days had elapsed since the notice and proofs were furnished, the defendants had not paid the $5000. The answer of the defendants contained five articles or parts. The first ignored, and so traversed the plaintiff's interest in the life of Fish. The second alleged that Fish did not perform and comply with all the conditions of the policy to be performed and complied with by him, and did many acts and things prohibited by the terms of the policy. Also, that the plaintiff had not made proof, in the manner provided in the conditions annexed to the policy, of the death of Fish, and that such pretended proofs omitted to state truly the cause of his death. The third averred that among the written statements and representations made to the defendant by the plaintiff respecting the life, health, &c. of Fish, presented to the defendant before issuing the policy, and in consideration of which the policy was issued, there was a written statement and representation by Fish, in which he stated and represented that his health was, at that time, good; that he had not been afflicted since childhood with liver-complaint, or general debility. There was also a statement by one Shipman, in which Shipman stated that he believed Fish to be then in good health; that he considered Fish healthy, and free from any circumstance tending to shorten life; that he believed Fish did not indulge in any habits or practices which had impaired, or would impair, his health or constitution; that he believed that the occupation, employment and manner of life of Fish did, in his opinion, agree with his constitution; and that Fish's prospects of attaining old age were as good as those of any man. That the plaintiff and Fish at the same time referred to one Marsh respecting the gen-

eral health and manner of life of Fish, and procured and delivered, or caused to be procured and delivered, to the defendants, a paper signed by Marsh, and which was one of the written statements on which the policy was issued, in which Marsh declared that Fish did not, to his knowledge, indulge in any habits or practices which had impaired or would impair his constitution and general health; that he had not any reason to believe that Fish had an impaired or feeble constitution; that he considered Fish healthy and free from any circumstances tending to shorten life; that his opinion was, considering the general longevity of Fish's family, his occupation, habits, constitution, general and present health, that the chance of Fish's living to old age was as good as that of ordinary persons. That the plaintiff and Fish procured from one Holmes, and forwarded to the defendants a statement of Holmes, that Fish did not, in his opinion, indulge in any practices or habits which had impaired or would impair his constitution and general health; that he believed the questions contained in the application were fully and properly answered, and that no material fact was omitted; and that Fish was likely to live to old age. That the policy was issued on the express warranty of the party assured, that all the said statements were and that each of them was true; and that if any misrepresentations or concealments were contained in the statements or representations, the policy should be void, and all the premiums should be forfeited to the company. And that each and every statement in the said written statements and representations of Fish, Shipman, Marsh and Holmes, in this article of the answer referred to, was false; that Fish and the plaintiff, before and at the time of issuing the policy, had notice thereof; and that by reason of the premises the policy was void. The fourth article of the answer averred that before and at the time of issuing the policy, Fish was and had long been a man of licentious, intemperate and disorderly habits and practices, and frequently or habitually indulged in habits and practices which had impaired or would

impair his health and constitution, and shorten his life; and in the frequent or constant habit of neglecting or violating the laws or rules of good conduct or regimen, on which health and long life greatly depend. All which the plaintiff, Fish, Shipman and Marsh well knew, or had good reason to believe, at the time their representations were made, and at and before the issuing of the policy; and though the defendant was ignorant thereof, they did not nor did any of them give notice thereof to the defendant, but concealed the same; and the policy was therefore void. The fifth article averred that Fish "died in consequence of intemperate drinking," and that by reason thereof the said insurance ceased and terminated; and no right of action had accrued thereon to the plaintiff. On the trial the defendants, on the call of the plaintiff, produced and the plaintiff put in evidence the proofs of loss furnished by him to the defendants, and proved that such proofs were delivered to the defendants in March, 1857. The plaintiff also proved that on the 28th day of May, 1850, Fish and one Holmes, as partners, were indebted to the firm of Reed & Rawls, of which the plaintiff was a member, in the sum of $9675.73, and that no part of the debt had been paid. The plaintiff then rested, and the defendant moved for a nonsuit, which was denied, and the defendant excepted. The defendant then offered and read in evidence the statements of Fish, Shipman and Marsh, and adduced testimony for the purpose of showing that, prior to the application for the policy in suit, July, 1853, Fish was of intemperate habits. The plaintiff adduced testimony tending to show that Fish was not of intemperate habits when the policy in suit was applied for. The court then charged the jury; to portions of which charge the counsel for the defendant excepted. The following question was submitted to the jury for their answer: "Question. Was John L. Fish, on the 16th of July, 1853, to the knowledge of Mr. Marsh, in the habit of intemperate drinking, to such an extent as had impaired or would, in the opinion of Mr.

Marsh, impair his constitution or general health?" The jury found a verdict for the plaintiff for \$6081.57, and answered the question submitted to them, as follows: "The jury think the statement made by Mr. Marsh, on the 16th of July, 1853, was truthfully made, according to the best of his knowledge."

*L. Birdseye,* for the plaintiff.

*H. R. Selden,* for the defendants.

*By the Court,* JOHNSON, J.   The contract of insurance, if honestly and fairly obtained, was a valid contract in its inception.   The plaintiff had an interest in the continuance of the life of the party insured, being his creditor.   The fact that the debt was due to him as a member of a partnership, and from another partnership, of which Fish was a member, can make no difference.   Fish, as a member of his firm, was individually liable for the whole debt, and the plaintiff, as a partner in his firm, was interested in the whole debt.   It seems to me there is no difficulty whatever in this. The contract of insurance does not relate to the payment of the debt, but to the continuance of the life insured, and all that is necessary to make the contract a valid one is, that the party procuring it should have some interest in the continuance of such life.   (*Ruse* v. *Mutual Benefit Insurance Co.,* 23 *N. Y. Rep.* 516.)   If a policy like the one in question is to be regarded as a mere contract of indemnity, being valid in its inception, it seems to me that the circumstance that the statute of limitations had run against the debt, before the occurrence of the death, would not affect it.   Because, whatever may be said in regard to the statute upon the debt when it has once run, it is certain that the debt is not extinguished, to all intents and purposes, as in the case of a payment.   The law still recognizes its existence, so far as to permit it to form a valid foundation and consideration for its own renewal by a new promise.   And indeed without any

new promise it may be enforced, by action, unless the defense of the statute is set up by answer. The law will scarcely presume that the debtor will, under such circumstances, either refuse to revive the debt, by a new promise, or that he will interpose the defense of the statute of limitations in case an action is brought to recover the debt. I think it cannot be held that the interest of the creditor, in the continuance of the life of his debtor, has ceased entirely, because the statute of limitations has operated against the debt.

But it is unnecessary that the party holding the life policy should have an insurable interest in the continuance of the life assured, at the time of the death, to make the policy valid, if it was valid in its inception. (*St. John* v. *The American Mutual Life Ins. Co.*, 3 *Kern.* 31, *and note at the end of the case. Valton* v. *The National Loan Fund and Life Assurance Co.*, 22 *Barb.* 9.) A policy of this kind is not regarded as a mere contract of indemnity. Indeed I am entirely unable to see how, upon principle, and in the nature of things, it can be regarded as a contract of indemnity at all, in any proper sense of that term. Marine and fire policies are strictly contracts of indemnity, as all the cases and authors agree. But how can a life policy be regarded as such, whether the life is assured in favor of the party himself, or in favor of his creditor? In the case of a creditor, if the undertaking was to pay, in case the debt was not paid during the lifetime of the debtor, or within a certain specified time, it would be clearly in the nature of a contract of indemnity. But when the undertaking, in terms, is to pay a certain fixed sum within a specified time after proof of the death of a certain person, in consideration of an annual sum to be paid to the party thus undertaking, it is impossible to see how it can be regarded as a contract of indemnity. If it were a mere contract of indemnity, how could it be upheld in the hands of an assignee, who has not and never had any interest whatever in the life assured, except that which springs from the contract. The nature and consideration of the un-

dertaking are the same, precisely, whether the policy is given to the individual, upon his own life, or to his creditor; and it is difficult to see why the obligation, or the remedy, should differ in one case from the other.

The case of *Goodsall* v. *Baldero*, (9 *East*, 72,) in which it was held that a policy like the one in question was a contract of indemnity, and that where the debt was paid, there could be no damnification, and no action would lie upon the policy, whether the debt was paid from the estate of the debtor, or with funds from some other source, has been recently over-ruled in England, after much and careful consideration, in the exchequer chamber, and is not now law there. (*Dalby* v. *Life Assurance Co.*, 18 *Com. Bench Rep.* 365; 80 *Eng. Com. Law Rep.* 365.) As an original question, independent of the authority of the books and of adjudged cases, it can scarcely admit of doubt that the decision in *Goodsall* v. *Baldero* was erroneous, and founded in a palpable misconception of the nature and character of such a contract. It absolved the insurer from the performance of his obligation, not because the event upon which payment was to be made had not happened, but because something else had been done for which no provision had been made by the contract; and that too by parties in no way interested in the contract, and being in no privity with either of the parties thereto. The insurers were permitted to keep the consideration, which had been punctually paid, and relieved from paying what they had expressly undertaken, upon fair and ample considera-tion, to pay, because the agreement was assumed to be in law different from what the parties had in express terms made it, when they entered into it.

The contract received its interpretation not according to its terms and stipulations, but its obligation upon the in-surers was made to depend upon a circumstance wholly col-lateral and accidental, and in respect to which the parties by their contract made no stipulation whatever. It was treated precisely as though the non-payment of the debt was insured

against.  However firmly this doctrine may now be rooted in the text books and decisions in this country, it is impossible, as it seems to me, that it can stand when a case in which it is directly involved is presented for adjudication in our courts of last resort.

But, as I have before remarked, I do not consider it necessarily involved in this case.  The position of the defendant, on this question, is a step decidedly beyond the rule laid down in *Goodsall* v. *Baldero*, as there is no pretense here that the plaintiff has ever received his debt, or any part of it, since the contract was entered into ; and I do not think the doctrine of that case should, under any circumstances, be extended, even if it is to be followed in cases precisely analogous.

Even if the defendants would have been entitled to subrogation, upon payment, according to the terms of the policy, there is nothing in its terms which required the plaintiff to keep the debt alive for their benefit, and his neglect to do so cannot affect their obligation to pay as they have agreed.

The action was not prematurely commenced.  The proof of the death of Fish seems to have been made in March, 1857, and it does not appear that the action was commenced previous to the expiration of ninety days thereafter.

I do not see upon what principle the previous declarations of Fish, in respect to his habits, could have been admitted as evidence upon the trial.  It was not his contract, and he had no authority to bind the plaintiff, by any statement he might make in regard to himself, whether true or false.  It would have been mere hearsay, and was properly rejected.  His declarations, as between these parties, were incompetent to prove either the fact of his previous intemperate habits, or the fact of the suppression of the information.

The question to the witness Moore, as to whether he would regard a person who was in the habitual use of intoxicating drinks to excess, an insurable subject, was, I think, properly

overruled. The witness, however eminent as a physician, might have very little knowledge as to what kind of persons insurance companies might properly venture to insure. Even if he had been in the business and practice of insuring lives, the evidence would have been incompetent, as it would have been, in effect, but an opinion as to what insurers of lives ought to do in certain cases. (*Jefferson Ins. Co.* v. *Cotheal,* 7 *Wend.* 72, 78, 79. *Campbell* v. *Rickards,* 5 *Barn. & Adol.* 840; 27 *Eng. C. L. Rep.* 207.) It was competent for the plaintiff to prove by Holmes that he presented the paper and read it to Marsh; especially in view of Marsh's evidence, that he had no recollection of the transaction. It was certainly proper, to show that no fraud had been practiced upon Marsh, or in getting up the papers on which the policy was issued.

The evidence in answer to the question put to the witness Holmes, as to whether in his opinion Fish did, at the time, indulge in any practices or habits which had impaired, or which would impair, his constitution and general health; and also that in answer to the question put to the witness Shipman, as to whether he believed his answers to the questions in the papers correct, at the time, can only be sustained on the ground that the defendants, in their answer, had directly alleged that these persons in answering the questions in the papers, upon which the policy was issued, had in these respects made statements contrary to their opinions, and to what they believed to be true. As the defendants had in their answer made that issue, I think it was competent for the plaintiff to meet it by his evidence.

The questions put to the witness Shipman, and also to the witness Dean, as to what their opinions would have been in respect to Fish's health, and the character of the risk, if they had known his habits and practices to be as alleged by the defendants, were of the same character as the question to the witness Dr. Moore, and were properly overruled, for the same reason. I think the statements of Dean and Holmes were

properly received in evidence as part of the papers on which the policy was issued. That they were so, appears by the answer, and the defendants had introduced the other papers and made them part of the evidence in the case. Under such circumstances, it was manifestly proper that all the papers on which the application was founded, and all those on which the defendants acted in issuing the policy, should appear in the case.

The statements of Marsh cannot, I think, be regarded as warranties binding upon the plaintiff. It appears, by the terms of the policy, that it was issued upon the statements on file, and dated July 15, 1853. The statements of Marsh were not made at that date, but afterwards, and then not as part of the application of Fish or of the plaintiff; and neither of them knew what the statements were. And although it may be true that the defendants were influenced in issuing the policy, to some extent, by the statements of Marsh, and Holmes, and Dean, and acted upon them in part, still, as their statements were not furnished by the plaintiff, or Fish, and the application was not based upon them, they are not their statements, and hence not warranties.

It is quite clear, I think, that Holmes was acting throughout as the agent of the defendants, and in no other way. It seems to me that it is not in the power of the defendants to convert statements which the plaintiff did not furnish, or rely upon, and of the character of which he had no knowledge, into warranties to defeat the policy, even though they may have been influenced by them in giving the policy. The judge charged, that inasmuch as Marsh was referred to as an acquaintance and friend of Fish, the plaintiff would be responsible for the good faith, and for the truth and honesty, of such statements, and if they were untrue in point of fact it would avoid the policy, whether such untruth originated in fraud, or mere negligence, or want of recollection. This, it seems to me, was going quite far enough.

I think the judge was right, also, in charging the jury that

if Fish answered truly all the questions put to him, without evasion or concealment, it was sufficient, and that it was not necessary for him to make any statement in respect to any particular habit, not called for by any general or specific question put to him; and that the omission, under such circumstances, to make any statement in respect to such habit, would not be such a concealment as to avoid the policy. As to the condition of his health he did answer fully, and as the jury have found, truly, all the questions propounded. But in respect to his habits of eating or drinking no question was put to him, and he had the right to suppose that no information was desired by them upon that subject; and the omission to give it in such case is no concealment.

No court would, I think, require a party to make a statement as to his habits and practices, some of which might possibly operate prejudicially upon his health, where nothing of the kind is called for by the questions propounded. The presumption is, that the insurers questioned the party upon all subjects which they deemed material, and all which were within the contemplation of the parties at the time; and beyond that, clearly, a party is not bound to disclose.

There was therefore no error, either in the rulings on the trial or in the charge, and a new trial must be denied.

[Monroe General Term, March 3, 1862. *Smith, Welles* and *Johnson,* Justices.]