RAWLS v. THE AMERICAN MUTUAL LIFE INSURANCE COMPANY.

Where a creditor procures an insurance upon the life of his debtor, his insurable interest continues, although the statute of limitations would have barred his action, if pleaded, before the debtor's death.

It seems that the contract of life insurance is not one for indemnity merely, and that if the insured had an interest in the duration of the life when he took the policy, he may recover, though that interest has ceased: *Per* WRIGHT, J.

Where the insurer pleads the falsity of representations as to the health of the party whose life is insured, evidence is admissible from the plaintiff as to his health prior to the application for the policy.

The admission of such party, made after the plaintiff obtained the policy, that his own habits were intemperate, is inadmissible.

Proof is inadmissible that a person addicted to intoxicating drink is not regarded as an insurable subject by persons engaged in the business of life insurance.

When a person, who had signed written statements in respect to the health of the party, stated as a witness that he had no recollection of having done so, it is competent for the plaintiff to prove that such statement was read to him, for the purpose of repelling any presumption of fraud in obtaining his statement.

So it is competent to prove by a physician, who made a written statement, the truth of which was in issue, that he made the statement in good faith.

It is not competent to call for the opinion of physicians, who had made statements in respect to the party insured, whether, if they had known that he habitually indulged in intoxicating drink, they would have regarded that practice as impairing his constitution, or of the examining physician, in behalf of the insurers, whether, with like knowledge, he would have regarded the life as healthy and the risk good.

The plaintiff is entitled to give in evidence all the papers on which the insurers acted when they granted the policy.

A statement procured by the insurer in respect to the life insured, from a third party named by the person whose life is insured, but the contents of such statement not known to him or to the plaintiff, and not furnished as a part of the application, is not a warranty.

When all the questions put to the parties desiring the insurance are fully and truly answered, it is not a fraudulent concealment if they omit to state facts, though material to the risk, not called for by any specific or general question.

APPEAL from the Supreme Court. Action on a policy of insurance issued by the defendant, dated 28th July, 1853, for $5,000, on the life of John L. Fish, of Rochester, N. Y., payable to the plaintiff. The answer denied, 1st. The allegations of the complaint, as to the plaintiff's interest in the life of Fish; 2d. Alleged that Fish did not conform and comply with all the conditions of the policy, and that the plaintiff had not made proof of the death in the manner provided in the conditions annexed to the policy; 3d. Alleged the contents of certain statements and representations of Fish, F. W. Shipman, James C. Marsh and W. F. Holmes, respecting the life, health and medical history of Fish, presented to the defendant by the plaintiffs, before issuing the policy, and in consideration of which the policy was issued; and then averred that such written statements and representations were false, and that Fish and the plaintiff had notice thereof, and that the policy, by reason thereof, was void; 4th. Alleged that before and at the time of the issuing of the policy, Fish was a man of licentious, intemperate and disorderly habits and passions, and frequently or habitually indulged in habits and practices which had impaired, or would impair, his health and constitution and shorten his life; all which the plaintiff, Fish, Shipman and Marsh well knew, or had good reason to believe at

Rawls *v.* American Mutual Life Insurance Company.

the time the representations were made, and before the issuing of the policy, and although the defendant was ignorant thereof, they gave it no notice, but concealed the same, and the policy was, therefore, void; 5th. Alleged that Fish died in consequence of intemperate drinking, and that by reason thereof the insurance ceased and terminated.

On the trial, before Mr. Justice SMITH, at the Monroe Circuit, in January, 1861, the plaintiff, after reading in evidence the policy of insurance, with the conditions annexed thereto, put in evidence the proofs of the death of Fish, furnished by him to the defendant, in March, 1857. The plaintiff also proved that on the 28th May, 1850, Fish and one Holmes, as partners, were indebted to the firm of Read & Rawls, of which the plaintiff was a member, in the sum of $9,675.73, and that no part of the debt had been paid.

The plaintiff then rested, and the defendant moved for a nonsuit, on the following ground: The plaintiff had not shown that he had any interest in the life of John L. Fish. The debt of Fish & Holmes to Read & Rawls, if any, on the 28th July, 1853, was not, and is not now, owned by the plaintiff; the demand of the plaintiff, if any, was outlawed long before this action was commenced.

The nonsuit was denied, and the defendant excepted.

The defendant then offered and read in evidence the statements of Fish, Shipman and Marsh, and adduced testimony for the purpose of showing that, prior to the application for the policy in suit, in July, 1853, and at that time, Fish was of intemperate habits, and that, in fact, he died in consequence of intemperate drinking. The plaintiff introduced testimony tending to show that Fish was not of intemperate habits when the policy in suit was applied for; and that his death resulted from accidentally falling through a hatchway in his storehouse.

The court then charged the jury, and some exceptions were taken, which are noticed in the following opinion. The counsel for the respective parties agreed that the following question should be submitted to the jury for their answer:

"Was John L. Fish, on the 16th July, 1853, to the knowledge of Mr. Marsh, in the habit of intemperate drinking, to such an extent as had or would, in the opinion of Mr. Marsh, impair his constitution or general health?"

The jury found a verdict for the plaintiff for $6,081.57; and answered the question submitted to them as follows:

"The jury think that the statement made by Mr. Marsh, on the 16th July, 1853, was truthfully made, according to the best of his knowledge."

Several exceptions were taken to the admission or rejection of evidence:

1st. Two witnesses, Grant and Holmes (the latter of whom had been Fish's partner in business), and who knew him intimately from 1848 to 1853, were asked by the plaintiff: "When you first knew Fish, what was his health and constitution? and what was it down to 1853?" This was objected to, as immaterial, and also, in respect to the witness Grant, on the ground that he was not competent to give an opinion on the subject. The objection was overruled.

2d. The defendant's counsel offered to prove, by one Philips and other witnesses, the statements of Fish, in the fall of 1853, in relation to his intemperate habits. This was objected to, and the objection sustained.

3d. The defendant offered to prove, by persons skilled in the business of life insurance, that a person who was in the habitual use, to excess, of intoxicating drinks, would not be considered an insurable subject. This was objected to, and the objection sustained.

4th. Marsh had sworn that he had no recollection of ever having seen or signed the statement to which his signature was attached. Holmes, who was the agent of the defendant at Rochester, called on Marsh with this paper, and wrote down his answers as he gave them, after reading the questions to him. It was proposed to prove this, by Holmes, to which the defendant's counsel objected. The objection was overruled.

5th. The plaintiff asked Holmes this question: "Did Mr. Fish at that time [about the date of the policy], in your opinion,

Rawls v. American Mutual Life Insurance Company.

indulge in any practices or habits which had or would impair his constitution or general health?" Objected to generally by the defendant's counsel, and the objection overruled.

6th. Dr. Shipman, the family physician of Fish, made a medical examination of him, in reference to the insurance. On the trial, the doctor testified that he examined him carefully; he appeared to be in good health, very good; and the witness signed a written paper. On this paper being produced and shown to him, he was asked: "Did you then believe the answers to these questions to be correct?" Objected to by defendant's counsel, and objection overruled.

7th. The examining physician of the defendant, Dr. Dean, was asked this question: "If you had known, at the time you made this examination [referring to the medical examination of Fish when the policy was issued], that Fish was in the habit of using intoxicating liquors to excess, would you have regarded his life healthy, and the risk good?" Objected to by the plaintiff's counsel, and the objection sustained.

8th. The plaintiff offered in evidence the statement of Dr. Dean (the defendant's examining physician), which was objected to by defendant's counsel, but the objection was overruled.

9th. The plaintiff also offered in evidence the statement of W. F. Holmes, who acted as the agent of the defendant at Rochester, in effecting the insurance, which was objected to by the defendant's counsel, and the objection overruled.

10th. The court charged that Holmes, in answering the questions to him put, and making the statement by him signed, and dated on the 16th July, 1853, was to be deemed and regarded in law as the agent of the company, and not of the plaintiff; to which exception was taken by the defendant.

11th. The court further charged that the statement of Mr. Marsh, dated 16th July, was not a warranty. To which there was an exception.

12th. The court further charged (to which exception was taken) that if Fish answered frankly and truly all the questions put to him, then there was no concealment. The mere

omission to state matters not called for by any specific or general question, would not be a concealment, and would not affect the validity of the policy.

On appeal, the judgment was affirmed at a general term, in the seventh district, and the defendant appealed to this court.

*Benedict & Boardman,* for the appellant.

*Lucian Birdseye,* for the respondents.

WRIGHT, J.    The defendants, in form, contracted with Fish for an insurance upon his life. In consideration of certain statements and representations made, and a premium of $117, to be paid annually, in advance, the defendants promised and agreed with Fish, his heirs or other legal representatives, to pay the sum of $5,000 to the plaintiff, within twenty days after the proof of the death of Fish, provided the policy should then be in force. If this is to be regarded and treated as a contract with Fish to insure his own life, then the question attempted to be raised on the motion for a nonsuit, viz., that the plaintiff had no insurable interest in the life of Fish, and, hence, that it was a gaming or wagering policy, cannot arise. If the contract is with the party whose life is insured, he may have the loss payable to his own representatives, or to his assignee or appointee ; and whichever be the form, his own interest is the same. It can only be by holding the policy in substance and legal effect, that of a creditor upon the life of his debtor, that an interest was necessary on the part of the plaintiff to support it.

I am inclined to regard the insurance as effected by the plaintiff on the life of Fish, although the policy, in form, purports to have been procured by the latter. The plaintiff applied for and obtained it as the creditor of Fish, to protect his interest as such creditor, in Fish's life. He took the initiatory steps for procuring the policy ; the application stated it to be for his benefit; he paid the original and all subsequent premiums; it was delivered to him, and he sues upon it as the party in interest, and as the only party connected with the

policy who could maintain an action upon it. So far as the question of its validity is involved, it will, therefore, be treated as a contract, in substance, between the plaintiff and the defendants.

It is not at all necessary to discuss the question whether a policy obtained by a party having no interest in the life insured, would be void, either at common law or under our statute against betting and gaming. It may be conceded that at common law it would be a wager policy, and void, although it was distinctly held in the Exchequer Chamber, on error, in *Dalby* v. *The India and London Life Assurance Company* (80 Eng. Com. Law, 365; *S. C.*, 28 Eng. Law & Eq., 312), that such an assurance was legal at common law. But the case is not embarrassed by any such question. It was distinctly shown and the proof in no way controverted, that the plaintiff was a creditor of Fish, when the insurance was effected, in an amount far exceeding the sum named in the policy, and that at the time of the trial the debt was still wholly unpaid. He had, therefore, within all the cases, an insurable interest in the life of Fish, sufficient to support the policy. It was in no legal sense a wager contract.

Nor is it necessary to consider the question whether a life policy is in its nature a contract of indemnity, as marine and fire policies undoubtedly are. Regarding the policy in this case as substantially a contract of indemnity against the loss of the plaintiff's debt, and that, as an interest was required to support its inception, a continuance of that interest is essential to its perpetuity, there was no pretense that the debt, or any part of it, had been paid. All that the case showed was that the statute of limitations had apparently run against the demand of the plaintiff at the death of Fish. But suppose the statute had attached, the interest of the plaintiff, as a creditor, in the continuance of the life of his debtor had not ceased entirely. The debt was not extinguished as in the case of payment. It might be renewed by a new promise, and, indeed, without such promise be enforced by action, unless the defence of the statute was directly interposed. It is not a legal presumption that

when the statute of limitations has once run, the debtor will refuse to revive the debt, by a new promise, or interpose the defence of the statute in an action to recover it.

But in the contract of life insurance it is enough that the party effecting the policy had an insurable interest, at its inception; and it is not required that that interest should continue and exist at the time of the death of the person whose life is insured, to entitle the holder of the policy to recover. Policies of insurance against fire and marine risks are properly contracts of indemnity, they are so in terms; but it is otherwise with life policies. The contract, says, PARKE, B., in *Dalby* v. *The India & London Life Assurance Company* (28 Eng. Law & Eq., 312), commonly called "life assurance, when properly considered, is a mere contract to pay a certain sum of money on the death of a person, in consideration of the due payment of a certain annuity for his life; the amount of the annuity being calculated in the first instance according to the probable duration of the life. * * * This species of assurance in no way resembles a contract of indemnity." Indemnity being the general principle which gave rise to fire and marine insurance, by a mistaken analogy such a principle was at one time recognized in life insurance. This recognition grew out of the decision in *Godsall* v. *Boldero* (9 East, 72), decided in the King's Bench, in 1807, which was followed and adopted by text writers on assurance, both in England and in this country, but which was overruled, on error, to the Exchequer Chamber, in 1854, in the case of *Dalby* v. *The India & London Life Assurance Company, supra.* In the latter case it was held that a life policy was not in its nature a contract of indemnity, but was what it purports to be on its face, a contract to pay a certain sum in the event of death; and if made by a person having an interest in the duration of the life, it was sufficient to make it valid in point of law that that interest existed at the time of making the policy. It seems remarkable to me that any other view should be taken of the question. The contract is not to make any loss good, or to make compensation. The debt is not insured. It is an absolute con

tract to pay, not the amount of a loss or damage arising from a death, but a specified sum of money upon the termination of the life insured.

The objection to the proof as to Fish's health, prior to the application for the policy in suit, was properly overruled. Such proof was not so far immaterial as to make it error not to exclude it. The written statements and representations made to the defendants, at the time the policy was effected, were, that Fish's health was good; and that he had not been afflicted since childhood with liver complaint or general debility. The defendants, in their answer, assert the falsity of these representations, and on the trial attempted, at least indirectly, to prove them to be so. I think it was competent for the plaintiff to prove that the representations were true, by showing that Fish was, in fact, in good health, and of a sound constitution. The witnesses to whom the inquiry was made, had known Fish intimately from 1848 down to the period when the policy was obtained, and were competent to testify to the fact of his general good health and soundness of constitution.

The offer of the defendants to prove the statements of Fish, made in the fall of 1853, in relation to his intemperate habits, was properly overruled. Fish was not, after the issuing to the plaintiff of the policy in suit, a party in interest in that contract, and could make no statement or admission that would divest the rights of the plaintiff. He was not, in any manner, the agent of the plaintiff, after the issuing of the policy, and so could not bind him. It might, with equal propriety, be pretended that the defendants could prove, by the admissions of Fish, that he had resided in forbidden districts, or engaged in occupations prohibited by the policy, and so escape payment. One class of unsworn statements of Fish would be about as admissible as the other, to discharge the defendants from their contract.

The defendants made a general offer to prove, by experts in the business of life insurance, that a person who was in the habitual use, to excess, of intoxicating drinks, would not be

considered an insurable subject. This was rightly excluded. It was entirely immaterial what description of subject, persons or companies engaged in the business of life insurance would consider good or bad risks. The inquiry did not relate to matters of science or skill, but called, in effect, for the opinion of witnesses as to what persons engaged in a particular business would consider prudent to do in certain cases. In *Joice* v. *The Maine Insurance Company* (45 Maine, 168), the defendants proposed to ask an expert in insurance business, whether, in his opinion, the rate of premium for insurance would be increased by vacating a dwelling house. The court held, that the question, whether certain specified facts would increase the rates of insurance upon the property insured, does not relate to matters of science and skill. It only called for the opinion of a witness upon the influence which certain facts would have upon others, and whether they would be induced thereby to charge higher rates of premium, and was inadmissible.

There was no error in proving by the witness Holmes, who acted as the agent of the defendants at Rochester, what occurred at the interview between him and Marsh. Marsh had been referred to, and had made a written statement as to the health and habits of Fish, which the defendants had introduced in evidence in connection with the testimony of Marsh himself, that he had no recollection of ever having seen or signed the papers. The proof that Holmes took the paper to Marsh, read the questions addressed to him, and wrote down the answers as he gave them, was, certainly, material and competent. Such proof tended wholly to negative any presumption that might otherwise possibly have been drawn from the defendant's evidence that there had been fraud in procuring the statement of Marsh, or in endeavoring to palm off on the underwriters a worthless life.

The defendants' agent, Holmes, transmitted to the company the papers on which the policy was issued, among which was a statement of his own, as agent or attorney. In this statement he answered, that Fish did not, in his opinion, indulge in any practices or habits which had or would impair his con-

stitution and general health. The defendants had pleaded this answer, and averred that it was false, and was known to be so, both by Fish and the plaintiff. The precise question was put to Holmes, as a witness upon the stand, a general objection interposed, which was overruled, and the witness answered as he had previously in his written statement. I do not think it was error to allow the question to be answered. The testimony bore directly upon the issue presented by the defendants' answer. It is now urged that the objection to the question should have been sustained: 1st. For the reason that it was not one of science, but related to a common place fact, and called, not for the knowledge of the witness, but for his opinion as to the existence of the fact; and, 2d. That if the question was one of science, the witness was not shown to have possessed any scientific skill on the subject. But the answer is, that no such grounds of objection were pointed out or urged to the judges.

Amongst the papers on the faith of which the policy was issued was, a written statement, in the form of questions and answers, of Dr. Shipman, the family physician of Fish. This statement was introduced in evidence by the defendants, and it was claimed that his answers were warranties. Every important answer was an expression of opinion or belief. The defendants, in their answer to the complaint, had put in issue the truth of the representations in the statement. On the trial, Shipman was produced as a witness by the plaintiff, who testified to his examination of Fish in reference to insurance upon his life; that he examined him carefully, and he appeared, at the time, to be in very good health. The written statement which he had signed, after such examination, was then shown to him, and he was then asked the question, "Did you then believe the answers to those questions (referring to the questions in the statement) to be correct?" This was objected to generally, and the objection overruled. It was not error. The defendants, in these answers, had, in substance, alleged a fraudulent statement to have been made by Dr. Shipman, in saying that he believed what he did not believe. Such a conclusion,

Rawls *v.* American Mutual Life Insurance Company.

I think, the plaintiff had the right to exclude by the proof covered by the exception. All, in fact, the inquiry amounted to was, whether the answers in the witness' statement had been made truthfully and in good faith.

On the cross-examination of Dr. Shipman, the defendants' counsel put this question: "If you had known that Fish did habitually indulge in the use of intoxicating drinks, to excess, would you have regarded that as a habit or practice that would impair his health or constitution?" and subsequently, on the cross-examination of Dr. Dean, the medical examiner of the company, he was asked: "If you had known at the time you had made this examination (referring to the examination made for the defendants), that Fish was in the habit of using intoxicating liquors to excess, would you have regarded his life healthy and the risk good?" An objection by the plaintiff to these questions was sustained by the court. This testimony was incompetent, both on principle and authority. It was of no consequence what, in the opinion of these physicians in certain cases, and under a certain state of facts, would be a good or bad risk for a life insurance company to take, or what circumstances should be considered on the question of increasing or lessening the rates of insurance. These witnesses might give their opinion on matters of science connected with their profession; but were not receivable to state their views of the manner in which others would probably be influenced, if certain specified facts existed. (*Jefferson Ins. Co.* v. *Cotheal*, 7 Wend., 72, 78, 79; *Durell* v. *Bederley*, 1 Holt, 283; *Campbell* v. *Rickards*, 5 Barn. & Adolph., 480.)

It was not error to admit the statements of Dr. Dean, the defendants' examining physician, and Holmes, their agent, at Rochester. These were parts of the papers on which the policy was issued, as appeared from the defendants' answer. The defendants themselves had introduced the other papers, being all, except the statements of their agents, and made them part of the evidence in the case. There was no impropriety under such circumstances, that all the papers should appear in the case.

It was the right of the plaintiff to lay before the jury all the papers on which the company acted, when it was decided to grant the policy.

It was not erroneous for the court to charge that Holmes, in making his statement, under date of 16th July, 1853, was to be deemed and regarded in law as the agent of the company, and not of the plaintiff. It is very clear from the evidence that, at the time the policy was effected, Holmes was acting as the agent of the defendants at Rochester, and it was through him the business was negotiated. There was no proof showing that Holmes had any agency, whatever, for the plaintiff, or for Fish, or that either of them knew that he was to make, or did make any such statement. The paper signed by him, on its face, purports to be that of an agent of the defendants.

The exception to that part of the charge in which the jury were instructed that the statement of Marsh was not a warranty, was not well taken. This statement was not so referred to in the policy as to become a part of it, or be made a warranty. The policy, in terms, states that it was issued upon the faith of certain statements and representations, dated July 15th, 1853, and on file, respecting the life, health and medical history of Fish. These were the statements of Fish and Dr. Shipman. Marsh's statement was made on the 16th July, 1853, and there was no reference to it in the application of Fish, nor did either Fish or the plaintiff procure it to be made, or know anything of the contents of the paper. It seems that it was a rule of the company to require of the person applying for insurance, a reference to some third person, from whom information might be obtained respecting his general health and habits of life. In this case, Fish referred to Marsh, and Holmes, the agent of the company, procured the statement of the latter, and forwarded it, with the other papers, to the office in Connecticut. The statement was not made as a part of the application of Fish or the plaintiff, nor was such application based upon it. It not being furnished by the plaintiff or Fish, nor the application based upon .it, it was not their statement, and hence not their warranty. A statement which the plain

Rawls *v.* American Mutual Life Insurance Company.

tiff did not furnish or rely upon, and of the nature of which he had no knowledge, cannot be converted by the defendants into a warranty to defeat the policy, although they may have been, to some extent, influenced by such statement in issuing it. The court went quite far enough, in instructing the jury, in substance, that as Marsh had been referred to as an acquaintance of Fish, the plaintiff would be responsible for the truth and honesty of his statements, and if, in point of fact, they were untrue, whether such untruth originated in fraud, or mere negligence or want of recollection, it would avoid the policy.

The third and only remaining branch of the charge singled out for exception, was the instruction, " that if Fish answered frankly and truly all the questions put to him, then there was no concealment. The mere omission to state matter not called for by any specific or general question, would not be a concealment, and would not affect the validity of the policy." This was not wrong. It may be conceded that if the applicant, when a specific or even general question is put to him, which would elicit a fact material to the risk, untruly stated or concealed the fact, it would vitiate the policy ; but I know of no case in the law of life or fire insurance, in which the insurers, having framed and put to the insured, and having had fully answered by him, a series of questions, calling for such information as they desired touching the subject insured, have been discharged from their contract because the insured did not go farther, and state what was not called for in the interrogatories. As was said by the learned judge, in the court below: " The presumption is, that the insurers questioned the party upon all subjects which they deemed material, and all which were in the contemplation of the parties at the time, and beyond that, clearly a party is not bound to disclose.

The judgment of the Supreme Court should be affirmed.

BALCOM, J. When the policy was issued, Fish was indebted to the plaintiff in a sum exceeding $5,000, which he had not paid at the time of his death, on the 24th day of February,

1857. But it was not shown but that Fish could have avoided paying such debt, if he had been sued therefor, at any time within two years previous to his death, by setting up the defence of the statute of limitations. By one of the conditions annexed to the policy it was agreed that no greater sum should be paid to the plaintiff than the amount of the debt due him, and that the policy was subject to interest. The defendants' counsel moved for a nonsuit, on the grounds, among others, that the plaintiff had not shown he had any interest in the life of Fish, and that the demand of the former against the latter was outlawed long before the action was commenced. And the defendants' counsel now insists that the plaintiff should have been nonsuited, for the reason that his demand against Fish was barred by the statute of limitations, at the time he died. This position is clearly untenable. The defendants could not say Fish ever refused, or would have refused, to pay the debt he owed the plaintiff, on that ground. That was a matter personal to himself, and a defence which he alone could interpose in an action for the debt. He was morally bound to pay the debt, and the defendants could not repudiate it for him. The plaintiff, therefore, had such an interest in the life of Fish, at the time he died, as kept the policy good. There is no adjudged case which holds this, but it is so upon principle. The moral obligation to pay a debt, barred by the statute of limitations, is a good consideration for a promise to pay it, and the presumption is that an honest man, if he has the means, will pay such a debt. It seems that a creditor of an infant has such an interest in his life as enables him to obtain a valid policy on his life, because the infant is the only person who can repudiate his debts, for his non-age at the time of contracting them. (Reynolds on Life Insurance, 60.)

In respect to the answers Fish made touching his habits and health, when the application for the policy was made, the judge charged the jury: "If he answered frankly and truly all the questions put to him, then there was no concealment. The mere omission to state matter not called for by any specific or general question would not be a concealment, and

would not affect the validity of the policy." There was no error in this. If the defendants desired more information respecting the habits of Fish, they should have asked him more specific questions. He was not bound to inform them whether he ate or drank much or little, or how often he did either, for the reason he was not interrogated as to such habits, and he could not have supposed the defendants desired information respecting the same, and, therefore, was not guilty of a fraudulent concealment in the omission to give it.

The judge did not err in any other part of his charge, or in admitting or rejecting evidence, and the judgment of the Supreme Court should be affirmed.

All the judges concurred, except EMOTT, J., who was for reversal, on the ground of want of insurable interest in the plaintiff, after the statute of limitations had run on his action against Fish; and SELDEN, J., who did not sit in the case.

Judgment affirmed.